**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
CHRISTINE LARKINS,

                         **Plaintiff,**                              **OPINION AND ORDER**

         -against-                                                   **07-CV-1700 (NG)**

**MICHAEL J. ASTRUE,**

**Commissioner of Social Security,**

                         **Defendant.**
-------------------------------------------------------------x
**GERSHON, United States District Judge:**

         Claimant Christine Larkins brings this action pursuant to Section 205(g) of the Social

Security Act ("the Act"), 42 U.S.C. § 405(g), to review the final decision of the Commissioner of

Social Security denying her application for Disability Insurance Benefits.    Claimant and

respondent each move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules

of Civil Procedure.

         After filing for disability benefits on April 1, 1997, claimant received a hearing before

Administrative Law Judge ("ALJ") David Nisnewitz on June 22, 1998.  On August 17, 1998, the

ALJ determined that claimant was not disabled.  The Appeals Council denied review, but later

vacated that order so that it could consider additional reports by claimant's doctors.  Upon

reconsideration, the Appeals Council again denied review on October 31, 2001.

         After claimant appealed the action to this court, another judge of this court affirmed the

ALJ's decision.  The Court of Appeals for the Second Circuit vacated that decision and ordered

that the case be remanded to the ALJ in order to develop the record to determine (i) whether

claimant is impaired within the meaning of Listing 11.09 or, if not, (ii) whether claimant retained

the residual functional capacity to perform sedentary work.  The Circuit also instructed the ALJ

to resolve the inconsistencies between neurologist Dr. Charles Bagley's, March 4, 1998, report and Dr. Bagley's other reports together with neurologist Dr. David Rabinovici's 1999 report.

On remand, a second administrative hearing was held on May 3, 2006, before ALJ Nisnewitz, who again found that claimant was not disabled within the meaning of the Act. Then, claimant filed the present action challenging the ALJ's determination that claimant possessed the residual functional capacity to perform certain available jobs.[1]

**Facts**

The administrative record contains the following facts.

<u>Claimant's Background</u>

Claimant, born in 1941, completed high school and some college and then worked at Verizon (or its predecessors) for over thirty years. She was employed as a trunk assignor (locating telephone circuits on lines via computer and connecting one circuit to another), as a circuit designer and as a supervisor of trunk assignors. Claimant stopped her work with Verizon in June 1995 when she temporarily lost vision in her right eye and could no longer perform her duties, which required the use of a computer. Although claimant regained her sight, she alleges that she could not return to work because of disabling symptoms related to her multiple sclerosis (or, "MS").[2] Claimant resides with her son and his wife.

---

[1] At oral argument, counsel for the claimant stated that claimant did not challenge the ALJ's determination that claimant is not impaired within the meaning of the Multiple Sclerosis Listing.

[2] Claimant's disability claims are not based on her temporary loss of vision.

Medical Evidence

In June 1995, claimant began receiving treatment from neurologist Dr. Charles Bagley of the Queens-Long Island Medical Group ("QLIMG"). Dr. Bagley noted claimant's complaints: blurred vision, lack of balance, urinary incontinence and weakness on her left side. Dr. Bagley also completed a neurological exam which demonstrated abnormalities, including brisk tendon reflexes, bilateral ankle clonus[3] and a Marcus Gunn pupil[4] in the right eye. One month later, in July 1995, an MRI brain exam revealed abnormalities consistent with multiple sclerosis.

Dr. Bagley's notes from a November 6, 1996, examination, reflect claimant's paresthesias of the hands, slurred speech and "a lot" of fatigue in her legs. Dr. Bagley's notes from a March 11, 1997, examination reflects claimant's complaint of "chronic fatigue" as well as continued paresthesias, clumsiness of the upper extremities and weakness of the legs. According to Dr. Bagley, these complaints correlated with abnormalities on the neurological exam, including hyperflexia[5] and bilateral Babinski[6] signs. Dr. Bagley noted that claimant's "fatigue was the most disabling symptom as it often is in this condition."

---

[3] An "ankle clonus" is a series of abnormal, involuntary reflex movements of the foot caused by a neurological abnormality. See Taber's Cyclopedic Medical Dictionary (2002).

[4] A Marcus Gunn pupil occurs when a pupil of the eye responds by constricting more to an indirect than a direct light; this condition is considered a "retinal or optic nerve disease" which is an ocular pathology associated with Multiple Sclerosis. See id.; Laura Label, M.D. & Laura Obiso, Attorney's Textbook of Medicine § 85.32 (2000); L.G. Fisher, "The Ocular Manifestations of Multiple Sclerosis," J. Am. Optom. Assoc. (Dec. 1977).

[5] Hyperflexion is "increased flexion of a joint, usually resulting from trauma." Taber's Cyclopedic Medical Dictionary (2002).

[6] A Babinski sign is a loss of, or diminished, Achilles tendon reflex in sciatica and suggests an upper motor lesion. See id.; Label & Obiso, Attorney's Textbook of Medicine § 85.44. Another characteristic of upper motor lesions is weakness of the muscles. See id. § 85.48.

As of April 30, 1997, Dr. Bagley opined, based on his examinations between 2005 and 2007, that claimant could perform only work-related physical activities that involved standing or walking for less than two hours per day and sitting less than six hours per day. On November 12, 1997, Dr. Bagley completed a "Residual Functional Capacity Form," based upon these same examinations, opining that claimant could perform only work-related physical activities that included sitting for three or less hours and standing and walking for less than two hours per day. Dr. Bagley further opined that claimant could occasionally lift between five and ten pounds and that claimant had difficulties handling low levels of stress. In addition, Dr. Bagley stated that an MRI showed brain lesions that were consistent with MS.[7]

An examination by claimant's general physician, Dr. Vanita Kaul, also of the QLIMG, dated January 6, 1998, indicates that claimant continued to complain about weakness and fatigue.

A form entitled "Request for Neurological Information From Any Cause" completed by neurologist Dr. Bagley, dated March 4, 1998, indicates that Dr. Bagley had again observed both bilateral ankle clonus and bilateral Babinski signs. Dr. Bagley continued to opine that claimant's major limitation is "chronic fatigue" and that her ability to walk "is limited by fatigue." However, Dr. Bagley indicates that her ability to sit was not significantly impaired at that time and that claimant could sit eight hours without interruption.

Claimant visited Dr. Bagley multiple times during 1998 and Dr. Bagley's notes indicate a waxing and waning of claimant's symptoms. During an April 1998 visit, Dr. Bagley noted that claimant felt her legs were "stronger"; however, by June 1998, Dr. Bagley again noted claimant's fatigue, weakness, blurred vision and periodic incontinence.

---

[7] It is unclear whether this MRI is a new MRI or the same MRI taken in July 1995.

On July 1, 1998, Dr. Bagley completed another "Residual Functional Capacity Questionnaire." He indicated that claimant suffered from an unsteady gait, blurred vision and chronic fatigue correlated by "hyperflexia" and "babinskis." With respect to claimant's capacity for work, Dr. Bagley opined that claimant could sit continuously for 45 minutes and could stand continuously for one hour, but that claimant could sit and stand/walk only for less than two hours each during each work day. Dr. Bagley further opined that claimant's condition would require her to take unscheduled breaks during each work day, each hour for at least fifteen minutes. Dr. Bagley concluded that claimant's prognosis for multiple sclerosis was "fair." Notably, Dr. Bagley did not consider claimant to be a "malingerer." Finally, Dr. Bagley opined that claimant had been disabled since July 1, 1997.

On February 3, 1999, a medical examination was conducted by neurologist Dr. David Rabinovici. Dr. Rabinovici received claimant's complaints that she was experiencing dizziness, memory and concentration difficulties, "constant problems with balance" and frequent numbness in both her hands as well as both of her legs. Claimant also complained of "constant weakness in both legs . . . constant problem with urinary incontinence and constipation, and a constant problem with gait."

Upon physical examination, Dr. Rabinovici observed weakness in claimant's lower left extremities and a difficulty extending or flexing portions of her left hip and leg. Dr. Rabinovici also observed claimant's unsteady gait, which necessitated the use of a cane. Dr. Rabinovici did not observe problems with claimant's memory or speech, although he did observe a mild overshoot on the right hand/finger to nose test. After physical examination and review of claimant's medical records, Dr. Rabinovici concluded that claimant "appears to have a relapsing

form of multiple sclerosis [and claimant] appears to be totally disabled." He further found that claimant's prognosis was "poor."

On February 17, 1999, Dr. Bagley noted that claimant's only complaint concerned her left leg and that her fatigue was "much improved." On February 9, 2000, claimant reported no new complaints to Dr. Bagley. On October 3, 2000, however, Dr. Bagley reported a mild exacerbation of claimant's multiple sclerosis, including claimant's unsteady gait, paresthesias in her left leg and in both arms, worsening of blurred vision, fatigue and urinary incontinence. A Marcus Gunn pupil and difficulty with heel to heel walking were observed during a neurological exam.

On May 30, 2001, following a medical examination, Dr. Bagley completed a "Multiple Sclerosis Impairment Questionnaire." Dr. Bagley indicated findings of fatigue, balance problems, unstable walking, weakness in the left arm and leg, blurred vision, bladder problems and sensitivity to hearing. Dr. Bagley opined that the "fatigue is most limiting symptom" and that claimant's prognosis had deteriorated to "poor." Dr. Bagley also opined that claimant could not perform repetitive activity of "any kind", was incapable of handling "even 'low stress,'" and that her condition frequently interfered with ability to concentrate.

Dr. Bagley reported that, in a competitive work environment, claimant could sit only for one hour and stand/walk for an hour or less during an eight hour work day. Further, claimant's condition required her to break every thirty minutes, in order to move about, and she would likely be absent from work "more than three times per month."

According to claimant, Dr. Bagley left the QLIMG in either 2001 or 2002. However, "Progress Notes" by Dr. Kaul indicate that claimant continued to seek medical treatment through

the QLIMG at least eight times during 2002 and 2003. While references to "MS" are scattered throughout claimant's medical records for 2002 and 2003, the notes are substantially illegible.

Claimant's next examination by a neurologist occurred on May 17, 2004. Dr. Haldea of the QLIMG received claimant's complaints that she had weakness in her leg and urinary incontinence, but noted that claimant's multiple sclerosis was "stable." On examination, Dr. Haldea observed a Marcus Gunn pupil in the right eye, hyperflexia and a dragging of the left leg.

On November 10, 2005, neurologist and MS specialist Dr. Brian R. Apatoff reviewed claimant's medical records and performed a "detailed neurological exam."[8] Dr. Apatoff observed many symptoms previously noted by Dr. Bagley, including paraparesis, weakness in the legs, an unsteady gait and bilateral Babinski responses. Dr. Apatoff also noted claimant's "difficulties with bowel and bladder dysfunction," right arm weakness, reduced dexterity in the upper extremities and that "cranial nerve testing reveals an optic neuropathy with disc pallor, and involuntary eye movements."

Dr. Apatoff opined that "[i]t is highly probable that Ms. Larkins was unable to work in a normal and full and unlimited capacity since her diagnosis in June 1995."

On November 15, 2005, neurologist and MS specialist Dr. Andrew Sylvester reviewed claimant's medical records and conducted an "independent medical examination."[9] Dr. Sylvester also observed many of the symptoms previously noted by Dr. Bagley, including

---

[8] Dr. Apatoff, who was retained by claimant's counsel, is the Director of the Multiple Sclerosis Clinical Care and Research Center at the New York Hospital-Cornell Medical Center and an Associate Professor of Neurology and Neuroscience at Cornell University Medical College.

[9] Dr. Sylvester is a clinical specialist at The Multiple Sclerosis Research Treatment Center at St. Luke's-Roosevelt Hospital Center, University Hospital of Columbia University, College of Physicians and Surgeons.

The ALJ refers to Dr. Apatoff, supra, and Dr. Sylvester as "treating physicians," apparently assuming that these doctors treated claimant after her date of last insured.

moderate weakness in the lower extremities, Babinski responses "indicating nerve damage to nerves controlling strength," impaired sensations in the lower extremities and an abnormal gait.

Dr. Sylvester opined that claimant's verifiable neurological problems evidenced a "significant disability" which prevented her from working. He further stated that "in my opinion [claimant] has been unable to work since 1995." Notably, Dr. Sylvester stated that "[f]atigue is often underappreciated on these forms" and that "Ms. Larkin's descriptions of her fatigue are classic for MS." Similar to Dr. Bagley, Dr. Sylvester also concluded that the claimant was not a "malingere[r]."

Finally, aside from notations that claimant was prescribed Badamax, which caused allergic reactions, there are no treatments or pharmaceuticals that were prescribed to, but rejected by, Ms. Larkin.

<u>May 3, 2006, Hearing</u>

On May 3, 2006, the ALJ heard testimony from claimant, a non-examining medical expert, Dr. W. Cohen, and vocational expert, Pat Green. The ALJ did not receive testimony from any examining doctor.

As a threshold matter, during the course of the hearing the ALJ determined that claimant's "date of last insured" was December 31, 2003.

*Testimony of Claimant*

In addition to the claimant's background, discussed <u>supra</u>, claimant testified that she was given a prescription of Badamax for her MS in the late 1990s, but that she suffered an allergic reaction. Claimant also testified that she received bee sting treatment for nearly a decade and believed that it helped with her MS for some of that time.

Claimant testified that she has a "sensation" and numbness in both arms and hands, which can make it difficult to hold objects. Claimant also testified that she becomes fatigued and overwhelmed easily, in which case it is difficult for her to concentrate and her speech begins to slur. In addition, her fatigue has limited her ability to read, watch television and do housework. Claimant testified that her daily activities are limited to making her bed, preparing a small breakfast, vacuuming one room, taking a short walk and napping. From time to time she may attend a play with friends, but has difficulty sitting through the shows.

In addition, since 1996 claimant has taken two trips: first, in 2001, to Germany to visit family and, second, in 2005, on a cruise through the Caribbean (however, claimant testified that she stayed on the cruise ship).

*Testimony of Dr. Cohen*

Dr. Cohen conceded, at the outset of his testimony, that his opinion was limited by what he considered to be "relatively infrequent visits" of claimant to neurologists and the fact that notes associated with those visits "do not provide a lot of detail." Dr. Cohen further stated that claimant did not have a visit with a neurologist between October 2000 and May 2004.

Based upon his reading of the record, Dr. Cohen opined that "it would be reasonable to infer that," "given the nature of the condition," symptoms evidenced in claimant's neurological exam of May 2004 "would have been similar" to symptoms suffered as of December 2003, the claimant's date of last insured. The ALJ refused to allow Dr. Cohen to give this opinion because, in the ALJ's view, this opinion was merely an assumption which could not be based on the evidence in claimant's medical file. Dr. Cohen attempted to clarify that he was not making a "guess" concerning claimant's condition.

Dr. Cohen then opined that, between 1995 and 2000, claimant's medical notes reflected only a mild degree of weakness and a mild degree of gait instability which would allow for sedentary work.

Dr. Cohen testified that claimant's May 2004 examination reflects "significantly different" problems that would reduce claimant's ability to work. When questioned by the ALJ about whether Dr. Cohen knew this with a "medical certainty", Dr. Cohen responded that, "we are generally stuck mak[ing] inferences and we do it within the context of the patient."

The ALJ questioned Dr. Cohen about his opinion of claimant's condition between 2001 and 2004. Dr. Cohen responded that he could not comment on that period because of the lack of detail in the record. The ALJ then stated,

> [T]here is no evidence here between 2000, October 2000 and 2004, is what you said before. So I can't guess that if you can't guess that. I mean it's just not there. Okay. Again I can't pull it out of the air. I can't make it up right.

The ALJ then asked again whether any evidence showed that claimant could not perform sedentary work prior to the May 2004 examination. Dr. Cohen responded that the changes in the May 2004 examination from past reports suggested that the condition could have existed for some period of time. However, Dr. Cohen could not indicate the duration that the condition may have existed.

Dr. Cohen also testified that claimant could not have performed more than sedentary work prior between 1995 and 2003.

Dr. Cohen testified that the symptoms described by claimant, including fatigue, leg weakness, altered gait, heat sensitivity, blurred vision and urinary incontinence were consistent with, but not specific to, MS. Dr. Cohen also testified that MS-related fatigue can interfere with one's ability to focus and concentrate.

*Testimony of Pat Green*

Following the testimony of Dr. Cohen, the ALJ heard testimony from vocational expert Pat Green. Ms. Green testified that claimant was a highly skilled worker—both a trunk assignor and a manager—with many transferable skills. Ms. Green testified that there were "jobs to which these skills are transferable which are sedentary in nature and . . . [which] don't require significant focus and concentration." Specifically, Ms. Green identified "information clerk" and "referral and information aid."

However, Ms. Green also testified that, if claimant (i) "was unable to tolerate even low stress," (ii) "ha[d] pain and fatigue that would frequently interfere with attention and concentration," (iii) was "unable to perform fine manipulations," or (iv) had limitations that required her to "get up and move around approximately every 30 minutes for approximately ten to 15 minutes," then the claimant would not be able to perform any job.

The ALJ's February 20, 2007, Decision

On remand, the ALJ was asked to consider whether a developed record evidenced "disorganization of motor function" resulting in claimant being disabled within the meaning of the Multiple Sclerosis listing and, if not, then whether claimant could have performed her past work during the adjudication period.

After reciting claimant's testimony concerning her daily activities, claimant's medical records and the testimony of Dr. Cohen and Ms. Moore, the ALJ found that claimant was not disabled within the meaning of the MS Listing, during the adjudication period, because she did not have "disorganization of motor function" rising to the level of a disability. In the ALJ's

opinion, claimant's "[m]otor and sensory strength . . . were revealed to be generally normal, accounting for some weakness and fatigue."

The ALJ also concluded that claimant was able to return to her work as a trunk assignor and manager as of December 31, 2003, the date she last was considered insured. Specifically, despite a conclusion that claimant has had the severe impairment of multiple sclerosis since 1995, the ALJ held that claimant "retained the residual functional capacity to perform sedentary work; to lift and carry ten (10) pounds; to stand and walk two (2) hours out of an eight (8) hour day; [and] to sit six (6) hours out of an eight (8) hour day." In the opinion of the ALJ, "the medical records reveal that . . . claimant was able to manage her physical symptoms to a certain degree with a hybrid of traditional and non-traditional medicine." The ALJ stated that he was affording only "considerable", but not controlling, deference to claimant's treating neurologist Dr. Bagley because of what the ALJ perceived as a "lack of clinical correlation."

With respect to the testimony and complaints of claimant, the ALJ conceded that "[a]fter considering the evidence of record, the undersigned finds that claimant's medically determinable impairment could have been reasonably expected to produce the alleged symptoms"; however, the ALJ rejected "claimant's symptoms concerning the intensity, persistence and limiting effects of these symptoms [as] not credible" because "the positive findings on MRI [for MS] are not clinically correlated with any additional testing as outlined by Dr. Cohen to confirm the severity of the symptoms as reported by claimant." According to the ALJ, claimant's complaints are contradicted by Dr. Bagley's notations indicating that claimant was "neurologically stable" or had only "mild neurological impairment" during the relevant time period.

## Discussion

District courts are not empowered to review the Commissioner's denial of disability benefits de novo.  See Fishburn v. Sullivan, 802 F. Supp. 1018, 1023 (S.D.N.Y. 1992).  Absent legal error, the Commissioner's finding that a claimant is not disabled is conclusive if supported by substantial evidence.  See 42 U.S.C. § 405(g); Filocomo v. Chater, 944 F. Supp. 165, 168 (E.D.N.Y. 1996).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotation omitted).  "[T]he Secretary's findings are conclusive even when a court's independent analysis of the evidence may differ from the Secretary's analysis."  Ortega v. Shalala, No. 94-CV-0941, 1995 WL 133806, at *3 (S.D.N.Y. March 25, 1995).

In determining whether a person is disabled within the meaning of the Act, the Commissioner has established a five-step sequential process.  First, the Commissioner considers whether the plaintiff is currently engaged in substantial gainful activity.  If not, the Commissioner next considers whether the claimant has a severe impairment that significantly limits her ability to do basic work activities.  If she has such an impairment, the third inquiry is whether the impairment meets or equals a listed impairment. If the claimant does not have a listed impairment, the Commissioner then evaluates whether she can perform her past relevant work or make an adjustment to other work.  See 20 C.F.R. § 404.1520(a)(4).

When employing this five-step process, the ALJ "must consider" four factors in determining a claimant's entitlement to benefits: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir.1999) (citation omitted).

As discussed below, the ALJ failed to accord the appropriate weight to the physicians and neurologists who actually treated claimant and to the subjective complaints of the claimant, and the ALJ's determination that the claimant is not disabled was not supported by substantial evidence.

Treating Physician Opinions

When assessing the medical evidence, the ALJ is required to give "controlling weight" to the opinion of a claimant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2); Martin v. Astrue, No. 08-CV-5402, 2009 WL 2137412 (2d Cir. July 16, 2009). Here, the ALJ improperly discounted the opinions of treating physicians, including neurologist Dr. Bagley, who had treated claimant for at least seven years, in favor of a government doctor engaged solely for the purpose of the disability proceeding and who had never examined claimant.

*Dr. Bagley*

The ALJ failed to give controlling weight to the opinion of Dr. Bagley because the ALJ concluded Bagley's conclusions were not correlated by "other substantial evidence in the record." This holding was in error.

First, the ALJ used an incorrect standard in assessing, and discounting, the opinion of claimant's treating neurologist. Contrary to the ALJ's holding, the law does not require a treating physician's opinion to be "correlat[ed] from substantial evidence in the record"; rather, to be controlling, the opinion must not be underlined contradicted by substantial evidence. In addition, some medical diagnostic techniques must support the opinion. By requiring that the treating

physician's opinion be "correlated" by "substantial evidence," it appears the ALJ imposed a stricter standard than is required by law.

Second, Dr. Bagley's opinion is controlling in this case because it is well-supported by the results of diagnostic, laboratory and clinical tests and is not inconsistent with other substantial evidence. In Dr. Bagley's opinion, claimant's condition limited the amount of time she could work each day. In fact, although Dr. Bagley characterized plaintiff's MS as a condition that could produce "good days" and "bad days",[10] his examinations and evaluations of claimant, evidence a deterioration of claimant's capacity. The following chart sets forth Dr. Bagley's five assessments of claimant's ability to sit, stand or walk during an eight hour work day:

| Date | Standing or Walking | Sitting |
|------|---------------------|---------|
| 04/30/1997 | Less than two hours per day | Less than 6 hours per day |
| 11/12/1997 | Less than two hours per day | Three or fewer hours per day |
| 03/4/1998 | "Walking is limited by fatigue" | Eight hours per day[11] |
| 07/1/1998 | Less than two hours per day | Less than 2 hours per day[12] |
| 5/30/2001 | Less than one hour per day | One hour per day |

FIGURE A.

---

[10] "That the symptoms were sometimes better and sometimes worse does not contradict the doctor's opinion as to disability. The Social Security Administration in 20 C.F.R. Pr. 404, Subpt. P, App. 1 describes multiple sclerosis as a condition which is 'episodic in character.'" Mahoney v. Apfel, 48 F. Supp. 2d 237, 245 (E.D.N.Y. 1999).

[11] Although the Court of Appeals for the Second Circuit instructed the ALJ to resolve the apparent tension between Dr. Bagley's March 4, 1998, assessment and other assessments in the record, the ALJ failed to do so. However, the tension between these apparently conflicting assessments is explained by the fact that the debilitating symptoms of Multiple Sclerosis often wax and wane, as supported by the testimony of the government's own witness, Dr. Cohen. See also supra note 10.

[12] At the same time, Dr. Bagley opined that claimant could sit continuously only for 45 minutes, and stand continuously for one hour and would need at least a fifteen minute break every hour.

Following the May 2001 examination of claimant, Dr. Bagley further opined that (i) the prognosis of her MS was "poor," (ii) she could not perform any repetitive activity, (iii) she could not tolerate <u>any</u> stress, and (iv) she could work only less than two hours of an eight hour work day.

Dr. Bagley's assessments are well-supported by medical evidence. First, two references in the record to MRIs of claimant's brain reveal abnormalities or lesions consistent with MS. Second, through years of examination, Dr. Bagley routinely observed weakness in claimant's left leg, a lack of balance and an unsteady gait (in fact, claimant's gait deteriorated over time, eventually requiring the use of a cane). Third, Dr. Bagley observed a weakening of claimant's ability to use her lower extremities; for example, in March 1998, Dr. Bagley's noted that claimant had some weakness in her ability to push and pull, but, by May 2001, Dr. Bagley noted that claimant was <u>unable</u> to push or pull with her lower extremities. Fourth, a contemporaneous examination by a second neurologist, Dr. Rabinovici, confirms Dr. Bagley's opinion: in February of 1999, following a clinical examination of claimant, Dr. Rabinovici concluded that she has "relapsing MS", a "poor" prognosis and "appears to be totally disabled."

In addition, neither the ALJ nor respondent have identified "substantial evidence" contradicting Dr. Bagley's opinion. Consequently, the ALJ improperly concluded that Dr. Bagley's opinion was not entitled to controlling weight.

When proper weight is given to Dr. Bagley's conclusions set forth <u>supra</u> in Figure A, it is clear that the ALJ's opinion that claimant could "walk two (2) hours out of an eight (8) hour day" and "sit six (6) hours out of an eight (8) hour day," is not supported by substantial evidence.

<u>Other Examining Physicians</u>

In addition to examinations by Dr. Bagley, the record demonstrates that claimant underwent physical examinations by the following neurologists:  Dr. Rabinovici, in February 1999, Dr. Haldea, in May 2004, Dr. Apatoff, in November 2005 and Dr. Sylvester, also in November 2005.  Each of these examining neurologists noted that plaintiff suffered from MS accompanied by severe symptoms limiting her ability to work, such as incontinence, extreme fatigue, dragging of her left leg, sensory dysfunction in her arms and hands and a poor prognosis for her condition going forward.

The ALJ rejected the opinions of these examining doctors.  First, the ALJ rejected the opinion of Dr. Rabinovici because the ALJ believed Rabinovici's conclusion that claimant had chronic relapsing multiple sclerosis with a poor prognosis was inconsistent with Rabinovici's observations that claimant had a normal mental status, motor strength and deep tendon reflexes. Second, the ALJ rejected the opinion of Dr. Apatoff because "his findings are referable to the claimant's condition two (2) years after the expiration of the date of last insured."  Third, the ALJ failed to specify what, if any, weight was given to the examinations or opinions of Dr. Haldea or Dr. Sylvester.  However, at the hearing, the ALJ refused to allow Dr. Cohen, the government's non-examining neurologist, to base an opinion on an examination of Dr. Haldea because that examination had taken place five months after the claimant's "date of last insured."

By contrast, the ALJ accorded "great weight" to the opinion of the "state medical consultant," dated June 30, 1997—five and a half years prior to the "date of last insured"— which was based solely on a review of the medical records of claimant prior to mid-1997, rather than on an examination.  The ALJ also accorded "great weight" to the opinion of non-examining neurologist Dr. Cohen, who initially testified that it would be reasonable to conclude that

claimant was disabled as of the "date of last insured" based upon the neurological examination by Dr. Haldea in May 2004. However, after the ALJ rejected that testimony, Dr. Cohen testified that he could not conclude "with medical certainty" as to claimant's condition on December 31, 2003, the date of last insured.

While the treating neurologists, with the exception of Dr. Bagley, each examined claimant only a single time and, therefore, may not be entitled to controlling weight, the ALJ's rationale for disregarding their opinions is not justified.

First, the regulations require that greater weight be given to the opinion of a treating than a non-treating physician, especially where the examination by a non-treating physician is for the purposes of the disability proceeding itself. See Schisler v. Sullivan, 3 F.3d 563, 567-68 (2d Cir. 1993); Mackey v. Barnhard, 306 F. Supp. 2d 337, 344 (E.D.N.Y. 2004). Therefore, the substantial deference to the government's medical experts, who were non-examining and retained only for the purposes of disability proceedings, was in error.

Second, medical evidence subsequent to the cut-off date can be relevant to "determining the severity of [claimant's] condition prior to the eligibility cut-off date." Bettis v. Chater, No. 94-CV-1521, 1996 WL 19214, at *3-*4 (E.D.N.Y. Jan. 11, 1996) (citing Lisa v Sec. of Health and Human Svcs., 940 F.2d 40, 44 (2d Cir. 1991)). Consequently, the ALJ's rejection of Dr. Haldea's May 2004 examination, and his rejection of the opinion of Dr. Cohen's indication, based on this examination, that claimant was disabled as of the last insured date, were improper.[13]

---

[13] Indeed, Dr. Apatoff characterized claimant's condition as one of "progressive decline," stating that the decline evidenced by her medical records allowed him to opine that she "was unable to work in a normal full and unlimited capacity since her diagnosis in June 1995, as her symptoms preceded a diagnosis by at least 5 years."

Third, the ALJ's conclusion that certain opinions of examining doctors were entitled to less weight because the examinations were distant in time from the "date of last insured" is inconsistent with the weight given to the government's medical consultants. For example, while the ALJ rejected medical opinions which occurred five months and two years after the "date of last insured," he accorded "great weight" to an opinion given five and a half years prior to that date. Such an inconsistent use of the opinions of Dr. Haldea and Dr. Apatoff undermines the court's confidence in the ALJ's assessments of the medical evidence. See McGowan v. Astrue, No. 07-CV-2252, 2009 WL 792083, *9 (E.D.N.Y. March 23, 2009). Although Dr. Apatoff's and Dr. Sylvester's assessments were not entitled to the same deference as those of Dr. Bagley, the opinions of these highly qualified neurologists are useful in confirming the assessments by Dr. Bagley.

Complaints of Claimant

In determining whether a claimant is disabled, the Commissioner must consider "subjective evidence of pain and disability testified to by the claimant." Brown v. Apfel, 174 F.3d at 62. Although an ALJ may disbelieve pain testimony "after weighing the objective medical evidence in the record, [claimant's] demeanor, and other indicia of credibility," Marcus v. Califano, 615 F.2d 23, 27 (2d Cir.1979), the ALJ should consider that "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1985).

The Commissioner argues that, although the claimant's complained-of symptoms could have been reasonably expected, the severity of the symptoms was not supported by objective medical findings. "This position is unsupportable given that the diagnosis of multiple sclerosis has not been controverted and all of plaintiff's complaints related to impairments of her

neurological system which were consistent with multiple sclerosis." <u>Mahoney</u>, 48 F. Supp. 2d at 246. Claimant's statements were also supported by the reports of numerous neurologists and there is no evidence that plaintiff is prone to exaggeration. Indeed, multiple doctors noted that she is not a "malingerer." Finally, claimant's long employment history supports the conclusion that she is unable to work in any capacity.

### Remedy

Under 42 U.S.C. § 405(g), the court has the authority to reverse or modify the final decision of the Commissioner, with or without remanding for further proceedings. "[W]hen the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," <u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d. Cir.1980), reversal and remand for the sole purpose of calculation and payment of benefits is an appropriate exercise of the court's authority. <u>See</u> <u>Rosa v. Callahan</u>, 168 F.3d 72, 83 (2d Cir. 1999). Courts have found this remedy to be particularly appropriate where the record is fully developed and supports a finding of disability, and the plaintiff's application has been pending for several years. <u>See, e.g.</u>, <u>Curry v. Apfel</u>, 209 F.3d 117, 124 (2d Cir.2000) (Commissioner failed to sustain fifth-step burden of proof; application for benefits pending more than six years at time of decision by court of appeals, which found "that a remand for further evidentiary proceedings (and the possibility of further appeal) could result in substantial, additional delay"); <u>Balsamo v. Chater</u>, 142 F.3d 75, 82 (2d Cir.1998) (Commissioner failed to sustain fifth-step burden of proof; application for benefits pending more than four years at time of decision by court of appeals).

Here, over the course of twelve years, the record has been developed and reviewed by the ALJ, twice. Further, the ALJ applied an erroneous, and inconsistent, standard when assessing the claimant's treating and examining physicians as well as her complaints. To remand this case

for further consideration would be futile, as the only conclusion supported by the record evidence, after proper weight is accorded to the treating and examining neurologists, is that the claimant, because of complications from MS, did not have the residual functional capacity to return to work as of July 1, 1997.

In light of the court's determination that controlling weight be given to the opinions of Dr. Bagley, the Residual Functional Capacity Form completed by Dr. Bagley and dated July 1, 1998, provides a basis for the court's conclusion that the claimant was disabled as of July 1, 1997. See McCall v. Astrue, No. 05-CV-2042, 2008 WL 5378121, at *17 (S.D.N.Y. Dec. 23, 2008). That form states that claimant was able only to sit continuously for less than two hours per day, able to "stand/walk" continuously for less than two hours per day and that claimant "has been totally disabled and unable to work for 12 or more months since 7/1/97 to or through 7/1/98."

**Conclusion**

For the reasons stated above, the motion by claimant for judgment on the pleading is granted, and the motion by the Commissioner for judgment on the pleadings is denied. The case is remanded to the Commissioner solely for the calculation of benefits from July 1, 1997.

**SO ORDERED.**

**/s/ Nina Gershon**
Nina Gershon, U.S.D.J.

Dated: September 24, 2009
     Brooklyn, NY